IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| KENNEDY TODD, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 15-0156-WS-M |
| | ) |
| BI-LO HOLDINGS, etc., | ) |
| | ) |
|     Defendant. | ) |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 18). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 19, 20, 24, 25, 28), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion is due to be granted.

## BACKGROUND

According to the complaint, (Doc. 1), the plaintiff was employed by the defendant as a produce manager at Store 572 until November 2013, when he was terminated. The plaintiff, who is African-American, alleges that the defendant discriminated against him based on his race, both in discipline and in termination. The plaintiff also alleges that the defendant terminated him in retaliation for complaining of race discrimination. The plaintiff's claims are brought pursuant to 42 U.S.C. § 1981.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[1] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

Discrimination claims under Section 1981 and Title VII "have the same requirements of proof and use the same analytical framework." *Springer v. Convergys Customer Management Group*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007). The same is true for retaliation claims. *Butler v. Alabama Department of Transportation*, 536 F.3d 1209, 1212-13 (11th Cir. 2008); *Davis v. Coca-Cola Bottling Co. Consolidated*, 516 F.3d 955, 978 (11th Cir. 2008). The Court therefore applies Title VII cases in assessing the motion for summary judgment.

Because the plaintiff does not rely on direct evidence of discrimination, the shifting burden appropriate for cases resting on circumstantial evidence applies. In Title VII cases alleging discrimination, the burden is first on the plaintiff to establish a prima facie case. If he succeeds, the employer must meet its burden of producing evidence of one or more legitimate, nondiscriminatory reasons for the adverse employment action. The burden then shifts back to the plaintiff to show that the employer's proffered reasons are a mere pretext for illegal discrimination. *E.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002).

---

[1] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so."). "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs," and "[l]ikewise, district court judges are not required to ferret out delectable facts buried in a massive record …." *Chavez v. Secretary, Florida Department of Corrections*, 647 F.3d 1057, 1061 (11th Cir. 2011) (internal quotes omitted).

The same burden-shifting paradigm applies to cases alleging retaliation under Title VII and Section 1981.  *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

**I. Discriminatory Discipline.**

The complaint alleges that the plaintiff "was written up by the Store Manager, Jeremy McPherson, Caucasian, for out-of-date products in the Produce Department.  However, on information and belief, Mr. McPherson did not write up similarly situated Caucasian Managers for similar infractions of company policies."  (Doc. 1 at 2).

"To establish discrimination in discipline, ... a plaintiff must first make out a prima facie case demonstrating: 1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline."  *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000), *overruled in part on other grounds*, *Manders v. Lee*, 207 F.3d 1303, 1328 n.52 (11th Cir. 2003); *accord Rioux v. City of Atlanta*, 520 F.3d 1269, 1275-76 (11th Cir. 2008); *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999).  The defendant argues that the plaintiff cannot satisfy the third element of his prima facie case.  (Doc. 19 at 19).[2]

It is uncontroverted that, as produce manager, the plaintiff was responsible for ordering product, ensuring that product was fresh, checking the quality of product on the shelf, keeping out-of-date product off the shelf, and culling product not marked with an expiration date several times a day.  (Doc. 19 at 3-4; Doc. 25 at 1).  It is also uncontroverted that the plaintiff had chronic problems performing

---

[2] The plaintiff proposes that the Court change the third element to read, "that the plaintiff was replaced with someone outside the protected class."  (Doc. 25 at 16).  That is not possible, since the plaintiff in his discipline claim is complaining of being written up while employed, not of being discharged and replaced.

4

these and other duties over the years, both at Store 572 and in previous assignments. (Doc. 19 at 5-9; Doc. 25 at 2).[3]

McPherson arrived as manager of Store 572 in April 2011. (Doc. 19 at 9; Doc. 25 at 2). It is uncontroverted that, over the next 2½ years, the plaintiff was repeatedly cited for failure to perform his duties as produce manager. In particular:

- In July 2011, an auditor found several products in a cooler that were out of date (some by over a month) and missing price signs. The African-American co-store manager (Jackson) issued the plaintiff a verbal warning as a result.[4]
- In June 2012, the district director visited Store 572 and found the produce department in an unacceptable condition, with poor quality leafy lettuce, leeks, black radishes, pole beans and more, and with the lettuce section not properly cleaned in several days. This incident resulted in verbal warning issued by McPherson.[5]
- In October 2012, McPherson issued the plaintiff a written warning based on several issues, including failing to work over 50 cases of juice in the cooler (resulting in holes in the display shelves), failing to ensure an associate was available for the closing shift, and failing to cull bad product.[6]

---

[3] The plaintiff admits the deficiencies chronicled by the defendant but disputes their relevance because they precede the arrival of McPherson as store manager. (Doc. 25 at 2).

[4] (Doc. 20-4 at 21).

[5] (Doc. 20-4 at 22).

[6] (Doc. 20-4 at 23).

- In February 2013, Jackson issued the plaintiff a final written warning after finding 39 out-of-date products in the produce department.[7]
- In August 2013, McPherson issued the plaintiff another final written warning based on multiple out-of-date products, lack of culling, sanitation issues, and poor ordering/lack of product on ad items.[8]
- In four separate incidents over a two-week period in September 2013, McPherson found on display in the produce department: six cases of moldy raspberries; several bowls of cut fruit with no cover and no date markings; red pears with a code date of August 28; and almost an entire buggy's worth of out-of-date product. The September incidents culminated in the issuance, on October 3, 2013, of a third final written warning for poor department conditions; multiple out-of-dates; sanitation issues; failure to cull properly; and failure to respond to his over-ordering of product.[9]

(Doc. 19 at 9-15; Doc. 25 at 2-3).[10]

---

[7] (Doc. 20-4 at 24).

[8] (Doc. 20-4 at 25-26).

[9] (Doc. 20-4 at 27-28). The plaintiff "disputes" that he received a written warning as a result of the September 2013 incidents, (Doc. 25 at 2), but he cites no evidence supporting his position. In his deposition, the plaintiff testified only that he does not recall seeing the warning previously but conceded he could have. (Doc. 25-2 at 36). The written warning is in the record, and it reflects that the plaintiff "refused to sign or write any notes on this document." (Doc. 20-4 at 27-28). The plaintiff's receipt of this warning is thus uncontroverted for present purposes.

[10] The plaintiff denies that the situations of October 2012 and February 2013 were his fault, but he admits they occurred. (Doc. 25 at 2). And for purposes of discipline, both were his responsibility. The plaintiff attributes the October 2012 situation to the failure of produce employees to come to work and McPherson's resistance to the plaintiff working overtime, but he admits he was responsible for scheduling his subordinates and finding replacements if they did not show, (Doc. 19 at 12), and the prohibition on overtime was real and dictated from above. (Doc. 20-1 at 5; Doc. 20-3 at 3). The plaintiff's responsibility for the February 2013 incident is discussed *infra* note 16.

The plaintiff identifies two white comparators. (Doc. 25 at 10-12, 20-21). He has presented evidence that auditors twice found out-of-date product in the meat department managed by James Baumgartner and several times found out-of-date product in the deli department managed by Mary Moore. (Doc. 20-2 at 8-10). He has also presented evidence from McPherson that neither Baumgartner nor Moore received a verbal or written warning as a result. (Doc. 20-5 at 7, 12-13).

"When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, ... we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (internal quotes omitted); *accord McCann v. Tillman*, 526 F.3d 1370, 1373-74 (11th Cir. 2008). [11] "Though the comparators need not be the plaintiff's doppelgangers, the 'nearly identical' standard requires much more than a showing of surface-level resemblance." *Flowers v. Troup County School District*, 803 F.3d 1327, 1340 (11th Cir. 2015).[12]

McPherson[13] first issued the plaintiff a verbal warning after the district director found the produce department to have "unacceptable conditions," which included unculled product but also included lack of sanitation. McPherson next issued the plaintiff a written warning, not just for having out-of-date product but also for failing to keep the cooler supplied with juice and for failing to ensure proper staffing in the department. After Jackson issued the plaintiff a written

---

[11] *Burke-Fowler* invoked the "prior panel precedent" rule to select the "nearly identical" standard rather than the seemingly lower standard of "similar[ity]" articulated in some Eleventh Circuit opinions. 447 F.3d at 1323 n.2.

[12] The plaintiff concedes that the "nearly identical" standard applies. (Doc. 25 at 19-20).

[13] As noted, the plaintiff's claim is limited to write-ups issued by McPherson. (Doc. 1 at 2). This eliminates from consideration the two warnings issued the plaintiff by Jackson.

warning for out-of-date product, McPherson next issued the plaintiff another written warning, not just for having out-of-date product but also for sanitation issues and poor ordering.  Finally, McPherson issued another written warning, not just for having out-of-date product but also for sanitation issues and poor ordering.

As this recitation reflects, McPherson never wrote up the plaintiff just for having out-of-date or unculled product.  On all four occasions, the plaintiff's conduct also included poor sanitation, poor ordering, and/or poor staffing.  By the plaintiff's own argument, in contrast, the only fault of Baumgartner and Moore was out-of-date product.  (Doc. 25 at 20-21).  Moreover, all of McPherson's warnings were issued against a backdrop of previous discipline meted out against the plaintiff during McPherson's tenure at Store 572 (including two warnings issued by another, African-American manager); by the plaintiff's own argument, Baumgartner and Moore had no history of discipline, either by McPherson or by Jackson.

Because of these differences, the quantity and quality of the conduct of Baumgartner and Moore is not nearly identical to that of the plaintiff as to any of the four write-ups issued by McPherson.  *See, e.g., Burke-Fowler*, 447 F.3d at 1321-25 (comparators who were in romantic relationships with inmates, but which relationships began before incarceration, were not similarly situated to a plaintiff whose romantic relationship with an inmate began during incarceration); *Knight v. Baptist Hospital, Inc*., 330 F.3d 1313, 1316-17 (11th Cir. 2003) (comparator with similar history of problems with co-workers was not similarly situated to a plaintiff who also had performance and tardiness issues); *Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001) (comparator with one or two arrests was not similarly situated to a plaintiff with four arrests); *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (comparators with one policy violation were not similarly situated to a plaintiff with four violations).  Because the plaintiff cannot satisfy the third element of his prima facie case of

discriminatory discipline, the defendant is entitled to summary judgment as to this claim.

### III. Discriminatory Termination.

"To prevail on a claim for discrimination under Title VII based on circumstantial evidence, [a dismissed plaintiff] must show that … he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard v. Board of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003); *accord Flowers*, 803 F.3d at 1336. The plaintiff invokes the replacement option, (Doc. 25 at 16-17), and the defendant voices no objection. It is uncontroverted that the plaintiff was replaced by a white male. (Doc. 25 at 10). The defendant, by ignoring the issue in its reply brief, effectively concedes that the plaintiff can establish a prima facie case.

To meet its intermediate burden, a defendant must articulate a reason "legally sufficient" to justify judgment in its favor and must support its articulated non-discriminatory reason "through the introduction of admissible evidence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). The defendant "must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision." *Walker v. Mortham*, 158 F.3d 1177, 1181 n.8 (11th Cir. 1998). Thus, "[t]he defendant cannot testify in abstract terms as to what might have motivated the decision-maker …." *Id*. Here, the defendant identifies its legitimate, non-discriminatory reason for firing the plaintiff as "a pattern of performance deficiencies involving his failure to effectively manage the Produce Department." (Doc. 19 at 20). This is a legitimate reason for termination, and there is record evidence that it was the defendant's actual reason. (Doc. 20-1 at 8).

"The inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude

that the employer's proffered legitimate reasons were not what actually motivated its conduct" but "were a pretext for [discrimination]." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (internal quotes omitted). The plaintiff's burden is to "demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action." *Rioux* 520 F.3d at 1279. However, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Springer v. Convergys Customer Management Group Inc.,* 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original) (internal quotes omitted). To make this showing, the plaintiff may resort to "all the evidence," *Crawford*, 529 F.3d at 976, including "the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 143 (2000).

The plaintiff's documented problems up to October 3, 2013 are identified in Part I. The final written warning issued that date required the plaintiff, over the next 30 days, to take specified steps to improve conditions in the produce department, which improvements "must be made immediately." (Doc. 20-4 at 27). It did not happen. Instead, the uncontroverted evidence shows that:

- On October 16, 2013, the plaintiff left holes in the displays because he had not ordered enough product for a three-day sale.
- On October 18, 2013, the district director visited and found multiple sanitation issues in the produce department.
- On October 22, 2013, an auditor shut down the produce department's cut fruit process for lack of the plaintiff's certification that his staff had been trained to follow proper procedures.

- On November 4, 2013, a customer complained that rotten green beans were placed in the bottom of bags and covered with fresh green beans, a complaint McPherson visually confirmed as accurate.
- On November 7, 2013, the plaintiff and his department lead received overtime despite an instruction not to take overtime.
- On November 8, 2013, McPherson found multiple out-of-date products in the produce department, along with unculled produce and cut fruit without label or date.
- On November 12, 2013, the produce department ran out of bagged potatoes during a three-day sale due to the plaintiff's failure to notify management or take steps to rectify the situation.

(Doc. 19 at 15-17; Doc. 25 at 2-3).[14] The plaintiff was thereafter terminated on November 20, 2013. (Doc. 20-1 at 8).

The plaintiff's primary evidence of pretext is that Baumgartner and Moore were treated more favorably than he. (Doc. 25 at 19-21). A difference in treatment can be evidence of pretext, but only if the comparators are similarly situated to the plaintiff. *E.g., Rioux*, 529 F.3d at 1276, 1279-80. The plaintiff acknowledges that he must show his situation to be "nearly identical" to that of his comparators, but he stresses that "nearly" is not "exactly." (Doc. 25 at 20). The plaintiff is correct, but the situation surrounding his termination is so vastly different from that of Baumgartner and Moore that their continued employment

---

[14] The plaintiff denies that the situations of November 7 and 8 were his fault, but he admits they occurred. (Doc. 25 at 3). Moreover, for purposes of discipline they are his responsibility for reasons stated in note 10, *supra*. The plaintiff "disputes" the incidents of October 16 and 18, (Doc. 25 at 2), but he neither explains his dispute nor cites any evidence supporting it. In his deposition, the plaintiff testified that he recalled the district manager's October 2013 visit and findings and simply was unsure of the precise date it occurred. (Doc. 20-3 at 1-2). As for the October 16 incident, the plaintiff testified only that he does not recall it, without denying it occurred. (*Id.*). McPherson's declaration is evidence that the incident occurred, (Doc. 20-1 at 4), and the plaintiff has identified no contrary evidence, leaving the defendant's version uncontroverted.

11

could not furnish evidence of pretext even under a much lower standard of comparability.

As noted, the plaintiff has evidence that Baumgartner twice, and Moore several times, had out-of-date product in their departments. The plaintiff, however, had out-of-date product in his department on thirty or more occasions by the time he was fired. (Doc. 20-5 at 12). That is not comparable.

Moreover, the plaintiff received six verbal and written warnings before he was terminated, while Baumgartner and Moore received none. The plaintiff argues they should have received warnings, but it is uncontroverted that McPherson did not apply a zero-tolerance policy on out-of-date product but handled situations involving only a few items with a verbal reminder to be careful. (Doc. 20-5 at 12). As to only one of the incidents involving Baumgartner and Moore does the plaintiff have any evidence that the amount of product at issue rose above McPherson's threshold level for formal discipline. (Doc. 20-2 at 8-10; Doc. 24-2 at 2). So the best possible case for the plaintiff is six warnings for him, one for Baumgartner, and none for Moore. That is not comparable.

Third, as noted previously, the plaintiff's failures extended far past out-of-date issues, encompassing as well chronic issues in sanitation, ordering, stocking and staffing. Baumgartner and Moore, in contrast, had no such issues. That is not comparable.

While Baumgartner and Moore are not similarly situated to the plaintiff, Merle Jennings is. Jennings, who is white, was dairy manager until September 2012, when McPherson fired him for poor conditions in the back cooler, not doing daily tasks, and not checking for out-of-date product. (Doc. 20-1 at 9; Doc. 20-5 at 4). The plaintiff responds that Jennings' "situation was worse than" the plaintiff's, (Doc. 25 at 3), but without offering any evidence in support of his *ipse dixit*. McPherson's termination of a white male for conduct similar to the plaintiff's weighs strongly against pretext.

Also weighing against the plaintiff is his treatment by Jackson, the African-American co-store manager. As noted, Jackson issued the plaintiff a verbal warning in July 2011 and a final written warning in February 2013.[15] The plaintiff does not contend that Jackson was racially biased against him, yet Jackson dealt out the same kind of discipline, for the same problems, as did McPherson.[16]

The plaintiff's case at this point is thus well into negative territory. In a single paragraph, he lists several items he hopes will dig him out of this hole. They do not come close to doing so.

First, the plaintiff asserts that McPherson failed to support him by fully staffing his department with competent, well-trained employees, complained when he worked overtime in an effort to compensate for the understaffing (or no-shows), and refused to write up his underperforming subordinates. (Doc. 25 at 21).

The plaintiff has presented evidence that the produce department was sometimes understaffed,[17] but he has not presented evidence that McPherson did

---

[15] As discussed *infra* note 19, Jackson also issued the plaintiff a verbal warning in August 2010, prior to McPherson's arrival.

[16] The February 2013 incident involved 39 out-of-date products. The plaintiff suggests Jackson should not have written him up because he (Jackson) inspected the displays early in the morning, before the plaintiff had an opportunity to update the product. (Doc. 25 at 2, 5-6). That argument might have some appeal if the oldest product Jackson found was out of date by only one day, but in fact all of the product was at least two days out of date, with some of it over a month out of date. (Doc. 20-4 at 24). This means that the product was already out of date the day *before* Jackson's inspection. But even if Jackson was being overly harsh in writing up the plaintiff, he was being overly harsh with no discriminatory motivation, which continues to support the inference that McPherson's similar treatment of the plaintiff likewise reflected no discriminatory motivation.

[17] The plaintiff in brief says understaffing was "perpetual," (Doc. 25 at 4-5), but one of his supporting record citations does not exist, and the other says only that understaffing occurred "at times." It is uncontroverted that the produce department was fully staffed in the months preceding the plaintiff's termination. (Doc. 20-1 at 6; Doc. 20-5 at 32).

nothing about the situation. The only cited evidence is that, whenever he knew the produce department was understaffed, McPherson worked to fill the vacancy. (Doc. 20-1 at 6; Doc. 20-2 at 36; Doc. 20-5 at 32). Nor has the plaintiff identified any evidence that McPherson worked harder to fill vacancies in departments with white managers; on the contrary, he cites evidence that Mary Moore's deli department had worse turnover problems than did the produce department. (*Id*. at 5).

The plaintiff has presented evidence that, when produce employees did not show up for work and he could not borrow workers from other departments,[18] McPherson would not allow him to work overtime to get everything done and would complain when the plaintiff did so anyway. However, the evidence is uncontroverted that the prohibition on overtime was real and dictated from above, (Doc. 20-1 at 5; Doc. 20-3 at 3), and there is no evidence that McPherson authorized white department managers to incur overtime.

The plaintiff has presented evidence that McPherson refused the plaintiff's requests to write up his subordinates. The same evidence, however, reflects that McPherson refused because it was the department manager's job, not his, to make sure the department's employees did their jobs. (Doc. 20-3 at 13-14). Again, the plaintiff has no evidence that McPherson treated any white department manager differently.

Next, the plaintiff asserts that McPherson treated him disrespectfully. (Doc. 25 at 21). He cites as his evidence the declaration of a co-employee, who states that McPherson: (1) "left a very unprofessional message" on the plaintiff's answering machine; (2) "treated the plaintiff very unfairly" in store meetings; and (3) responded to the plaintiff's request for time off "with a smart answer or comment in front [of] the other employees." (Doc. 24-2 at 2-3). These incidents

---

[18] The plaintiff admits it was his responsibility to schedule his subordinates for all necessary hours and to find someone to cover the shift of any subordinate that canceled or failed to show. (Doc. 20-2 at 27).

14

are so mild and so vague as to be valueless.  Worse, there is no evidence that McPherson treated white employees more charitably and thus no inference that McPherson treated the plaintiff shabbily because of his race.

Finally, the plaintiff notes that he had been employed by the defendant as a produce manager since 1998 and had done just fine until McPherson came along in 2011.  The implication, the plaintiff says, is that McPherson "targeted" him and did so because he is black.  (Doc. 25 at 21-22).  The plaintiff, however, has had documented performance problems since 2004, which accelerated in frequency over the years before McPherson arrived.[19]  To the uncertain extent the plaintiff suggests (speculates) that McPherson cited him for conduct that previous supervisors would have let slide, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination," *Silvera*, 244 F.3d at 1261 n.5, for the sensible reason that "[d]ifferent supervisors may have different management styles that … could account for the disparate disciplinary treatment that employees experience." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1312 n.7 (11th Cir.), *opinion stricken and superseded in unrelated part*, 151 F.3d 1321 (11th Cir. 1998).

---

[19] In November 2004, the plaintiff was verbally counseled about the condition of the produce department. (Doc. 20-4 at 11).  In June 2005, he was written up after an audit gave the produce department a score of zero (out of 100). (*Id.*).  In October 2006, the plaintiff was written up for leaving rotten pumpkins on the sidewalk despite instruction to remove them. (*Id.* at 12).  In October 2007, the plaintiff was written up after an audit revealed critical violations in the produce department regarding the proper cooling of product and employees' knowledge of proper cold holding procedures. (*Id.* at 13-15).  In March 2008, the plaintiff received a verbal warning for failure to cull on two separate dates. (*Id.* at 16).  In December 2009, the plaintiff received a verbal warning after an audit revealed that mark-down coupons did not match the UPC. (*Id.* at 17).  In August 2010, the plaintiff received (from Jackson) a verbal warning after an audit found three salads almost a month past their sell-by date. (*Id.* at 18).  In February 2011, the plaintiff received a performance review form after the produce department received a low score, and one critical violation, on an audit. (*Id.* at 19).  The form reminded the plaintiff that "it is his responsibility to insure all items in his department are in date" and instructing him to retrain his associates "on the importance of pulling close and out of date products." (*Id.*).  The plaintiff disputes the relevance of this material but not its accuracy. (Doc. 25 at 2).

The foregoing exhausts the plaintiff's efforts to show pretext. As addressed above, the effort falls far short of casting doubt on the defendant's explanation – that it fired the plaintiff for chronic performance problems – sufficient to permit a reasonable jury to find that what really motivated McPherson was not those admitted performance issues but racial discrimination. The defendant is thus entitled to summary judgment as to the discriminatory termination claim.

### III.  Retaliatory Termination.

"A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). The defendant denies the plaintiff can establish the third element of his prima facie case. (Doc. 19 at 24-27).

"The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). The plaintiff invokes this rule. (Doc. 25 at 22-24).

The plaintiff identifies his protected activity as being three statements that McPherson was "racist against him." The first statement was made to the district director in June 2012. The second statement was made to the district director (but overheard by McPherson) on August 13, 2013, and the third was made directly to McPherson on August 28, 2013, when McPherson issued a final written warning. (Doc. 25 at 8-9). The plaintiff invokes the close-temporal-proximity test of causation only with respect to the last of these complaints, and he does not seek to support the causation element as to his other two statements. (*Id*. at 23). The Court therefore concludes that the plaintiff cannot establish a prima facie case of retaliation with respect to his first two complaints of racism.

The plaintiff was fired on November 20, 2013. (Doc. 20-1 at 8). From August 28 to November 20 is 84 days, or one week shy of three months. The plaintiff asserts that, under Eleventh Circuit law, a delay of "a little more than 2 months" between protected activity and termination satisfies the close-temporal-proximity measure of causation. (Doc. 25 at 3-4). The cases he cites, however, do not support that proposition. At any rate, the gap here is almost three months, not barely two months, and "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough" to constitute close temporal proximity. *Thomas*, 506 F.3d at 1364; *accord Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period between [the protected expression and the adverse action] does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.").

To shrink the gap between protected activity and adverse action, the plaintiff asserts that the decision to fire him was made before November 20. (Doc. 25 at 23). The plaintiff may be correct, but he identifies no evidence from which any inference can be drawn as to when the decision was made relative to November 20.

The plaintiff points out that he received a written warning on October 3, 2013, approximately five weeks after he complained to McPherson of racism. (Doc. 25 at 23). As the plaintiff argues, this means there is close temporal proximity between his complaint and the warning. But the plaintiff has not sued for retaliatory discipline, only for retaliatory termination; the relevant adverse action for purposes of causation is not the warning but the termination.

Ultimately, it does not matter whether the plaintiff can establish a prima facie case. The defendant's legitimate, non-discriminatory reasons for the plaintiff's termination are the same as those given in Part II, (Doc. 19 at 20, 27-28), and the plaintiff admits his evidence of pretext is the same for retaliation as it is for discrimination. (Doc. 25 at 24). But the plaintiff has identified no evidence

17

that his indicia of retaliatory motive – understaffing, denial of overtime, refusal to discipline subordinates, disrespect, warnings, and more favorable treatment of white department managers – began or worsened after August 28. That is, the plaintiff has no evidence that McPherson's treatment of him became any harsher after he complained of racism. There is thus nothing in the plaintiff's evidence to suggest that McPherson retaliated against him in any of these particulars and thus no inference that McPherson also retaliated against him in terminating his employment.

"Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010). In particular, a plaintiff "cannot insulate herself against termination by making a discrimination complaint in response to being placed on probation for the same inadequate work that ultimately led to her discharge." *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 Fed. Appx. 831, 839 (11th Cir. 2015). The plaintiff accused McPherson of being racist when McPherson issued him a final written warning for admitted, chronic performance problems. He could not thereby insulate himself from termination when those performance problems admittedly continued and worsened over the next three months.

Because the plaintiff has cast no doubt on the defendant's explanation sufficient to permit a reasonable jury to find that what really motivated McPherson was not the plaintiff's admitted performance issues but retaliation, the defendant is entitled to summary judgment as to the retaliatory termination claim.

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is **granted**. Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 24th day of May, 2016.

s/ WILLIAM H. STEELE<br>
CHIEF UNITED STATES DISTRICT JUDGE